REDMANN, Judge
(dissenting).
A testator whose will leaves to his wife the entire disposable portion and to his four children only their forced portion unmistakably sets forth — beyond argument— that he does not want those four children to have their full intestate share of his estate if his wife survives him. Therefore, at least by inescapable implication, the testator has “declared in the testament” or made “testamentary provision” against applying a statutory rule which would give those four children an intestate share at the expense of the wife’s legacy.
The question is whether this testamentary declaration or provision is sufficient within C.C. 1705[1] to prevent, at least in part, the revocation of the will by the birth of a fifth child three years after the will was written. The wife (who was also named executrix) appeals from a judgment declaring, on demand by the testator’s major child of a first marriage, that the will was entirely revoked by the subsequent birth.
Art. 1705’s provision for revocation is not found in the 1804 Code Civil of France; see Planiol, Civil Law Treatise (La.Law Inst, trans.), Ill, 2852; Aubry & Rau, Testamentary Successions & Gratuitous Dispositions (La.Law Inst, trans.), § 724. In Louisiana, neither the 1808 Digest nor the 1823 Projet provides this revocátion. It does appear in the 1825 Code, art. 1698. Its apparent source is the 13th century Las Siete Partidas, Bk. 6, tit. 1, law 20, which had force in Louisiana prior to the 1825 Code; see Comment, 15 Tulane L.Rev. 272, 275 (1941); Succession of Carbajal, 1923, 154 La. 1060, 98 So. 666; Succession of McRacken, 1926, 162 La. 443, 110 So. 645.
Carbajal refused to apply the unqualified revocation rule of the unamended text of Art. 1705: “The testament falls by the birth of legitimate children of the testator, posterior to its date.” Carbajal’s testator had six children and his wife was expecting the seventh when he wrote his will, leaving to his wife his movables and the usufruct of his immovables, and providing, the court said, “that his unborn child should share equally with the others in the remainder of his estate.” 98 So. at 668.
The pivotal reasoning in Carbajal is that “we are not compelled to give literal effect to words of a law, when the result would be to deny a particular class a fundamental right [that of testation] enjoyed by all other citizens, when the reason or underlying cause for the distinction has ceased to exist.” (On Carbajal’s narrower factual situation, the class denied testation would have been only parents expectant at the time of writing a will.)
The I960 and 1974 amendments to art. 1705 have conformed the article to Carba-jal and additionally allowed testamentary prohibition of revocation even if no testamentary provision is made for the after-born child.
In my view the reasoning of Carbajal remains applicable: the right of testation is fundamental; it cannot be defeated by revocation for a cause that does not justify revocation.
Especially since the amendment of art. 1705, an unprovided-for after-born child does not justify revoking the will, except to the extent that the providing of an intestate share for that child requires revocation.
In every case, the patent reason for revocation by subsequent birth is the natural supposition that the testator would no longer intend his estate to be distributed under a will which made no provision for his child because executed when the child did not exist; Lewis v. Hare, 1853, 8 La.Ann. 378; McRacken, supra; Carbajal, supra.
However, not even in Las Siete Partidas was the rule of revocation absolute: after-born (or after-adopted) children only revoked wills “in which they have not been *926 established as heirs.”[2] Thus if the testator’s intent were that the will should govern despite the subsequent birth (as shown by his will’s provision making the after-born child an heir), the Partidas’ law of revocation by its own terms did not apply.[3]
The 1966 amendment to C.C. 1705 has recognized anew and given greater force to the basic principle that it is the testator’s intent which governs (compare C.C. 1712), and now, to the extent that the testator’s intent is clear, the law need no longer supply “by its own foresight the want of foresight of the testator” (Lewis, supra, 8 La.Ann. at 379).
Our testator did not have the foresight to give, in his will, complete instructions: but he has at least provided that, rather than pure intestacy resulting in each of his children inheriting a fifth, he wanted the first four children to have only one-fourth each of the two-thirds forced portion, and he wanted everything else that those four children would otherwise inherit to go to his widow. It is unclear whether he would have wanted each of those four to have only a fifth of the forced portion, since at the time of his will “their” forced portion was a fourth each of the overall two-thirds forced portion: it is certain that he considered that fourth adequate for those four, but it is not certain that he wanted his widow to have the entire disposable portion even if her having it would reduce the share of those four from a fourth of the two-thirds forced portion to a fifth. (Compare C.C. 1722’s rule on the time as of which legacies should be construed.)
Therefore the subsequent birth of the fifth child cannot have the effect of complete revocation, including increasing the share of the four pre-existing children who were provided for in the will. The birth of the fifth child inescapably revokes the will only to the extent necessary to provide an intestate share of one-fifth to be inherited by the after-born child. The resulting partial revocation cannot reduce the legacies to the four other children, because full revocation would bring those children a larger share: therefore the rule providing revocation cannot, by limiting its effect, be construed to bring them a smaller share.[4] The partial revocation can only reduce the legacy to the wife — which would be reduced to zero were revocation to produce intestate distribution. The wife’s legacy must therefore be limited to the disposable portion less the after-born child’s inheritance of a fifth (which, insofar as composed of community property, is subject to the wife’s usufruct, C.C. 916).[5]
*927 One last point: the interpretation of C. C. 1705 to declare ineffective the will’s appointment of an executor or attorney, or directions for disposition of the testator’s remains or the like, is unconstitutional because it provides a capricious and whimsical result in no way related to C.C. 1705’s legitimate purpose. Carbajal’s principles oblige us not to deny the executrix-naming aspect of testation to our testator, irrespective of whether after-born children’s inheritance rights prevented the effectiveness of legacies of the disposable portion. The after-born child, at least during minority, cannot be executor (or attorney or mortician or clergyman): why, then, should his birth defeat the testator’s provisions on these matters?[6]

. The text of C.C. 1705, at the time of the birth of the fifth child and at the time of the testator’s death, are found at n. 1 of the majority opinion.

. “en que non ouissen seydo establescidos por herederos.”

. A significant difference in wording occurs in Spain’s 1889 Código Civil, art. 814: the omission from the will of any'existing or after-born child annuls “the institution of heir” (“la institución de heredero”) but not the will itself, and specifically not the testamentary directions (“mandas,” presumably including directions as to who was to be executor or attorney) nor provisions for extra portions (“mejoras”). See Manresa, Comentarios al Código Civil, VI, 375-380.

. On the other hand, partial revocation of the legacy of the disposable portion does not result in a “portion of the succession remaining undisposed of” which falls to the intestate heirs (all of the children) under C.C. 1709. The testament did dispose of all of the testator’s property.

.(1) The effect of this construction of C.C. 1705 is similar to that long given to C.C. 3061 by cases such as Saulet v. Trepagnier, 1847, 2 La.Ann. 427.
C.C. 3061 provides that “The surety is discharged when by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety.” (Emphasis added.) However, Saulet and its progeny read art. 3061 to provide, in effect, that “the surety is discharged to the extent prejudiced . . . . ”
The effect of the proposed construction of C.C. 1705 is to read it to provide that “A testament is revoked to the extent necessary to provide an intestate share for any after-horn children . . . . ”
(2) The basic effect of this reading of C.C. 1705 is to partially revoke legacies to persons who would not take intestate, in order to provide the intestate share of after-born children. Since this reading of art. 1705 gives the after-born a right to claim an intestate share *927 analogous to the right of every omitted forced heir to claim a legitime, the articles on reduction of testamentary donations (C.C. 1510-1514) could provide principles applicable by analogy, and thus the basic rule could be “the reduction [the partial revocation] shall be made pro rata, without any distinction between universal dispositions and particular ones,” C.C. 1511.
(3) Of some interest, by analogy, is our 1808 Digest, p. 224, art. 74 (see West’s LSA-Civil Code, Compiled Ed.C.C. of La., Vol. 17, p. 757), providing that “all donations inter vivos made by persons having neither children, nor descendants actually living at the time of the donation, . . . shall continue revoked of right [demeureront révoquées de plein droit] by the birth of children to the [donor] . . . .” [Compare Spain’s Código Civil art. 644’s similar provision.] By thus limiting complete revocation to cases of no pre-existing children (following C.N. 960), the 1808 Digest recognized that complete revocation in cases of pre-existing children was a non-sequitur: the donor who already has children yet donates to the prejudice of those children cannot be supposed not to have realized that his children would be prejudiced by the donation. See Planiol, III §§ 2657-2676; Aubry & Rau, § 709.
Louisiana’s 1808 Digest (like the French Code) did not, however, have a provision similar to today’s C.C. 1705. When the 1825 Code redactors included the substance of today’s C.C. 1705 (from Spanish sources), they modified the quoted 1808 rule, to revoke inter vivos donations only to the extent the disposable portion was exceeded; C.C. 1556 (1825). This 1825 revocation-rule was wholly unworkable while the donor lived, since it is impossible to determine the disposable portion before the testator is dead (by which time fortune good or bad may have altered his estate drastically). Moreover, the 1825 revocation-rule was an unnecessary duplication of every forced heir’s right of reduction of excessive donations, irrespective of whether the forced heir pre-existed the donation. Presumably these considerations prompted the 1870 Code’s redactors to omit any provision similar to the 1825 Code’s art. 1556.
(4) Finally, it is noted that the subsequent birth of a child where none previously existed requires 100% of the estate to give that child his intestate share — as would the birth of two subsequent children if there pre-exist one, two, three or four other children.
In all other cases, however, the birth of one or even two children would not require 100% of the net estate to satisfy the after-born children’s intestate shares: some fraction will be left which could still go to the legatees of the disposable portion without conflicting with the raison d’etre of C.C. 1705. (For example, if five or more children pre-existed, their testament-time forced portion would have been two-thirds, and two after-born children would together take two-sevenths or less, which is less than the remaining third, thus leaving some fraction available for the other legatees.)

. In Spain — the ancient source of C.C. 1705 —the 1889 Codigo Civil, art. 814, avoids such a result; see n. 3, supra. See also Green v. Baptist Church of Shreveport, 1875, 27 La. Ann. 563, which rejected the demand of an after-born child to annul a sale by an executor named in the (revoked by C.C. 1705?) will. (The succession was insolvent; the court reasoned “we do not see how [the child] has been injured by the sale of which she complains.”)